## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

PATRICIA R. WALTON,          )
                                     )
               PLAINTIFF,        )
                                     )
vs.                             )     CASE No. 08-CV-391-FHM
                                     )
MICHAEL J. ASTRUE,          )
Commissioner of the           )
Social Security Administration,    )
                                     )
              DEFENDANT.     )

## OPINION AND ORDER

Plaintiff, Patricia R. Walton, seeks judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits.[1] In accordance with 28 U.S.C. § 636(c)(1) & (3) the parties have consented to proceed before a United States Magistrate Judge.

The role of the Court in reviewing the decision of the Commissioner under 42 U.S.C. §405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Doyal v. Barnhart*, 331 F.3d 758 (10th Cir.

---

[1] Plaintiff's December 7, 2005 application for Disability Insurance Income benefits was denied initially and upon reconsideration. A hearing before an Administrative Law Judge (ALJ) was held July 12, 2007. By decision dated September 11, 2007, the ALJ entered the findings which are the subject of this appeal. The Appeals Council denied review of the findings of the ALJ on May 9, 2008. The action of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

2003).  The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

Plaintiff was 49 years old at the time of the hearing. [Dkt. 14, p. 24].[2]  She claims to have been unable to work since September 16, 2005, due to neck, back and shoulder pain and muscle spasms in her right hand. [Dkt. 14, pp. 27-31].  Plaintiff was last insured for benefits December 31, 2006.  Consequently, "to obtain disability insurance benefits, Plaintiff must establish that she became disabled on or before that date." *Washington v. Shalala*, 37 F.3d 1437, 1440 n.2 (10th Cir. 1994); *Potter v. Secretary of Health & Human Servs.*, 905 F.2d 1346, 1348-49 (10th Cir. 1990).  The ALJ determined that Plaintiff has severe impairments consisting of status post fusion at C3-4 and C4-5 and degenerative disc disease [Dkt. 14, p. 13], but that she retains the residual functional capacity (RFC) to perform light work activity with no more than occasional balancing and kneeling. [Dkt. 14, p. 14].  Based upon the testimony of a vocational expert (VE), the ALJ found that Plaintiff could not return to her past relevant work as a nurse's aide but that there are other jobs available in the economy in significant numbers that Plaintiff could perform with an RFC for light work. [Dkt. 14, pp. 16-17].  He concluded that Plaintiff is not disabled as defined by the Social Security Act.

---

[2] All citations to the record reflect the page number assigned by the CM/ECF docketing system. Since the CM/ECF system counts unnumbered cover pages and preliminary pages (i, ii, etc.) and the administrative record [Dkt. 14] was filed in three parts (14, 14-2, 14-3), the docket reference may not necessarily be the same as page numbers or bates-stamped numbers on the document.

[Dkt. 14, p. 18].  The case was thus decided at step five of the five-step evaluative sequence for determining whether a claimant is disabled. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (describing the five steps); *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing five steps in detail).

Plaintiff asserts the following allegations of error: 1) "The ALJ failed  at step 5 of the sequential evaluation process because he improperly failed to include in his hypothetical any reference or limitation for Claimant's mental disorder; he improperly failed to include in his hypothetical any limitations on reaching, grasping and fingering, and ignored the vocational expert's testimony regarding what this proscription would do to the number of jobs available to Claimant; he failed to make his hypothetical precise because he improperly omitted the necessary strength demands from his hypothetical; he failed to match the impairments of the hypothetical with the residual functional capacity and he failed to make the *Haddock* inquiry of the vocational expert prior to relying on her testimony." 2) "The ALJ failed to perform a proper credibility determination because he failed to determine which of Claimant's testimonial statements were believable as required; he improperly ignored treating source limitations; he miscast evidence of record; he ignored probative evidence of record; and he did not discuss the evidence of favorable credibility factors that he should have discussed." 3) "The ALJ failed to properly weigh the opinion of the treating physician who found Claimant disabled; did not properly explain why he chose one source over another in the light of the rules, regulations, and case law; and failed to consider other source information without doing the proper analysis about the other source opinion."

3

For the reasons discussed below, the Court reverses and remands the decision of the Commissioner.

## Medical History

The medical record shows that Plaintiff has a long standing history of hypertension, controlled with medication. [Dkt. 14-3, pp. 43, 38, 35, 29, 30, 26, 21, 16, 14, 08]. She was treated for this condition by Steven Landgarten, M.D., and Alex Lyle, PA-C., at Hillcrest Medical Group. *Id.* Plaintiff's gynecological and menopausal complaints were monitored by Melanie Mead, ARNP, (Advanced Registered Nurse Practitioner) starting in December 2002. [Dkt. 14-3, pp. 25, 23, 50; 14-2, pp. 13-16]. An osteoporosis screening on January 28, 2005, revealed mild osteopenia.[3] [Dkt. 14-2, 117-120].

On September 16, 2005, Plaintiff was seen at St. Francis Hospital emergency room following a motor vehicle accident in which her car was rear-ended. [Dkt. 14, 151-157]. She was diagnosed with acute cervical and upper thoracic strain, given motrin and Flexeril[4] and told to follow up with Dr. Landgarten. [Dkt. 14, p. 152]. Plaintiff went that same day to a chiropractor, Rick Bewley, with complaints of burning pain in the neck and right shoulder which radiated down the back. [Dkt. 14-2, pp. 81-83].

---

[3] Osteopenia is reduction in bone volume to below normal levels especially due to inadequate replacement of bone lost to normal lysis (process of disintegration or dissolution). See medical dictionary online at: http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=osteo penia (2009).

[4] Flexeril is a muscle relaxant and is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions. *Physician's Desk Reference*, 51st ed. (1997) 1592, 1701.

On September 19, 2005, Plaintiff was seen by Dr. Landgarten's physician assistant (PA), Alex Lyle, who observed decreased range of motion, positive moderate paraspinous spasms and increased pain with lateral gaze of the neck. [Dkt. 14-2, p. 12, 171].  Plaintiff was given Mobic[5], Flexeril and exercises to perform. *Id.*

Plaintiff underwent weekly chiropractic therapy from September 22, 2005 through October 25, 2005. [Dkt. 14-2, pp. 76-80, 48-50, 70-76, 62-67].  During that time, she was seen twice by PA Lyle who renewed her Flexeril and added Naprosyn and Lortab.[6] [Dkt. 14-2, pp. 10-11, 169-170].  She was also referred for an MRI, which revealed:

> 1) At C3/4, disc bulging and protrusion are prominent. There is flattening of the anterior spinal cord. There is mild narrowing of the central canal; 2) At C4/5, there is prominent disc bulging and protrusion that flattens the anterior cord surface. There is mild narrowing of the central canal and mild bilateral foraminal narrowing; 3) At C5/6, there is again prominent disc bulging and protrusion which flattens the anterior cord surface. There is moderate central canal stenosis and mild bilateral foraminal narrowing; 4) At C6/7, there is prominent disc bulging and protrusion. The central canal is moderately narrowed. The foramina are patent; 5) No cord edema or gliosis is identified; 6) Details above, level by level.

 [Dkt. 14-2, pp. 68-69].

On October 25, 2005, Dr. Bewley released Plaintiff to return to work with a restriction against lifting over 10 lbs. [Dkt. 14-2, p. 62].  The next day, Plaintiff was seen

---

[5]  Mobic is a non-steroidal anti-inflammatory (NSAID) used for the treatment of the signs and symptoms of osteoarthritis and rheumatoid arthritis. Physicians' Desk Reference (PDR) online at: 2008 PDR 0860-0200 (database updated August 2008).

[6]  Naproxen (Naprosyn) is a nonsteroidal anti-inflammatory drug with analgesic and antipyretic properties. *Physicians' Desk Reference* (PDR), 53rd ed. (1999) 2672.  Lortab (hydrocodone bitartrate and acetaminophen) is a semisynthetic narcotic analgesic and antititussive indicated for relief of moderate to moderately severe pain. *Physicians' Desk Reference* (PDR) 53rd ed. 3162.

by David A. Traub, M.D., a pain management specialist. [Dkt. 14, pp. 168-169; 14-2, pp. 54-55].  Dr. Traub assessed hyperflexion - hyperextension injury to the neck, mid back and low back; headaches secondary to the neck injury; bilateral shoulder sprains and bilateral plantar fasciitis. *Id.*  He prescribed arch supports for Plaintiff's shoes, Lodine[7] and Sterapred Dosepak "hopefully to reduce inflammation" and refilled Flexeril and Lortab while discontinuing Mobic. *Id.*  He also recommended Plaintiff continue therapy with Dr. Bewley. *Id.*

Dr. Bewley re-examined Plaintiff on November 1, 2005, and reported her neck pain was the same, with constant pain, her shoulders were the same with burning sharp pain, her headaches were better 10% and her left arm was the same. [Dkt. 14-2, pp. 63-67].  He referred Plaintiff to Oklahoma Physical Therapy for evaluation and treatment. [Dkt. 14-2, p. 56].

Plaintiff returned for follow-up care on November 8, 2005, to Dr. Traub who gave her an epidural steroid injection for neck pain and stated his opinion that Plaintiff was "temporarily totally disabled and not capable of engaging in her usual position as a CNA." [Dkt. 14-2, p. 52-53, 130-131; Dkt. 14, p. 170].  On November 11, 2005, Dr. Traub wrote: "Patient is to be off work until further notice." [Dkt. 14, 167].

On November 17, 2005, Plaintiff was seen by Steven C. Anagnost, M.D., at the Orthopaedic Center, upon referral from Dr. Landgarten. [Dkt. 171-172].  Dr. Anagnost examined Plaintiff, the MRIs and X-rays and recommended a course of aggressive

---

[7]  Lodine (Etodolac) is in a class of medications called NSAIDs and is used to relieve pain, tenderness, swelling and stiffness caused by osteoarthritis and rheumatoid arthritis. *See* medication information online at: http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692015.html (last reviewed - 09/01/2008).

physical therapy with cervical traction and a prescription for Lodine to compliment (sic) the narcotic analgesic and muscle relaxant. *Id.*

Dr. Bewley reported on December 30, 2005, that Plaintiff's neck was better 40-50%; shoulder spasm better 40-50%; headaches better, 2-3x/wk, 30%; and left arm better 30%. [Dkt. 14-2, p. 43-47].  On January 3, 2006, Dr. Anagnost reported to Dr. Landgarten that Plaintiff had completed therapy and that her motion had improved but she still had weakness, numbness and tingling and pain rated at five on a ten-scale. [R. 14-2, p. 90].  He recommended Plaintiff continue on a home program and scheduled an EMG[8] "to make sure there is not any active nerve damage taking place." *Id.*

Dr. Bewley recorded chiropractic treatments on January 16, 2006 and January 25, 2006 with no changes in Plaintiff's complaints. [Dkt. 14-2, p. 31].  Dr. Anagnost reported on January 26, 2006, that Plaintiff had completed her home therapy using an "e-stim unit" 2 to 3 times a day; that she complained of pain at 8 on a 10-scale when she gets up in the morning but that her pain leveled off to between 1 and 5 on the 10-scale over the course of the day. [Dkt. 14-2, p. 89].  He reported the EMG was normal and he recommended continuation of chiropractic care as well as the home exercise program and Advil, Aleve or Tylenol rather than Lortab. *Id.*

Dr. Bewley treated Plaintiff on January 30, 2006, February 3, 2006, February 6, 2006 and February 10, 2006. [Dkt. 14-2, pp. 30-31].  On February 10, 2006, Plaintiff told Dr. Bewley the pain in her neck, shoulders, headaches, left arm, right hand and

---

[8] Electromyopgraphy (EMG) is a test that checks the health of the muscles and nerves that control the muscles. *See* medical encyclopedia online at: http://www.nlm.nih.gov/medlineplus/ency/article/003929.htm (Update 9/22/2008).

upper midback was worse. [Dkt. 14-2, pp. 38-42].  Follow-up treatment notes by Dr. Bewley through the remainder of February 2006 show Plaintiff's pain improving as expected. [Dkt. 14-2, pp. 28-29, 33-37].

On March 9, 2006, Dr. Anagnost reported to Dr. Landgarten that all reasonable conservative measures for treating Plaintiff's cervical radiculopathy had been exhausted and he had referred her for a repeat MRI. [Dkt. 14-2, p. 88].  The MRI revealed severe degenerative changes, "the worst at C3-4 with herniated nucleus pulposus mass effect on the spinal cord and mild stenosis at C4-5." [Dkt. 14-2, p. 87].  Dr. Anagnost and his PA opined Plaintiff would benefit from a two-level discectomy and fusion at C3-4 and C4-5, stating they felt "that these are the levels that are causing her symptoms." *Id.*

The anterior cervical diskectomy and fusion with plating was performed by Dr. Anagnost on April 17, 2006. [Dkt. 14-2, pp. 96-112].  Plaintiff noticed immediate relief of her arm pain and neck pain symptoms upon awakening in recovery. *Id.*

On May 9, 2006, Dr. Anagnost reported Plaintiff was "doing well. She no longer has any severe numbness or tingling to her arm. She has achiness and spasming but she does notice a difference between her preoperative symptoms." [Dkt. 14-2, p. 86]. He reviewed with Plaintiff the intraoperative findings of osteopenia which required adjustment of the plate and screws to obtain good fixation and observed that, neurologically, Plaintiff was improved with motor and sensate. *Id.*  He said: "She needs to be careful with her lifting. She should wean out of her collar slowly. She cannot return back to work until four weeks time. I renewed her medication of Lortab 7.5 and Flexeril." *Id.*

Plaintiff expressed concern about depression to Dr. Landgarten on May 16, 2006. [Dkt. 14-2, p. 167].  He referred her for a behavioral health evaluation, though he did not indicate where. *Id.*  That same day, Melanie Mead, ARNP, conducted a "Well Woman Exam" and assessed menopause, bacterial vaginosis and osteopenia. [Dkt. 14-2, p. 166].  There was no mention of depression in her notations. *Id.*  Ms. Mead saw Plaintiff in follow-up for her pelvic exam on May 31, 2006; again with no mention of depression. [Dkt. 14-2, p. 165].

Jodie L. Popp, Dr. Anagnost's PA, reported on June 6, 2006, that Plaintiff had weaned out of her soft collar and was having some pain in the trapezius and rhomboid muscles which comes and goes.  "She said there is tremendous relief in the numbness and tingling in her arm that she had preoperatively." [Dkt. 14-2, p. 85, 124, 153]. Plaintiff told the PA that her OB/GYN provider had obtained a bone scan and given her a diagnosis of osteoporosis.[9] "In fact, she is described as having severe osteoporosis." *Id.*  PA Popp advised Plaintiff that, with the nature of her bone quality, she needs to be very careful and her healing time will be a little more extensive than planned. *Id.* Physical therapy with gentle range of motion was planned in approximately two weeks. *Id.*  Plaintiff's Flexeril and Lortab were refilled and Plaintiff was to be seen back in about five weeks for reassessment. *Id.*

A report dated June 20, 2006, by Shirley J. Brister, M.A., RPT, at the Orthopaedic Center, indicates Plaintiff complained of pain going into her arms, neck

---

[9] Osteoporosis is a condition that affects especially older women and is characterized by decrease in bone mass with decreased density and enlargement of bone spaces producing porosity and brittleness. *See* medical dictionary online at: http://www2.merriam-webster.com/cgi-bin/mwmednlm ?book=Medical&va=osteoporosis (2009).

and upper back. [Dkt. 14-2, p. 152].  Plaintiff was "very guarded with her range of motion" and was very drowsy, stating she had taken Lortab and Flexeril. *Id.*  Plaintiff was started on very gentle range of motion exercises and shoulder shrugs. *Id.*  The therapist's report one month later contains subjective complaints by Plaintiff of "severe headaches and muscle spasms in her neck down to her upper trap and about midway through her thoracic spine." [Dkt. 14-2, p. 151].

On July 25, 2006, Dr. Anagnost and his PA wrote: "She describes she is still having muscle spasm in the back of her neck and shoulders, more so on the right. She has no complaints of numbness or tingling in her upper extremities. She anticipated cutting back on her medications but has been on them for so long that she is concerned about reducing them." [Dkt. 14-2, pp. 122, 150].  The final paragraph in this treatment report reads as follows:

> We feel this area she is hurting as well as the complaints of muscle spasm is chronic in nature. We will refer her to chronic pain management. If her symptoms change in the future, she may return for reevaluation.

*Id.*

Dr. Traub gave Plaintiff two more epidural steroid injections in August 2006 before reporting on September 20, 2006, that they "really did not help her neck at all." [Dkt. 14-2, pp. 127-129].  He said:

> She's had continued neck pain and headaches. We talked at length today about her predicament. She says the neck surgery helped her arm symptoms, but her neck is not much better. She used to distribute medications at a retirement center and this job entailed lifting patients. She will be unable to lift patients in the future. She is struggling now, deciding how she will return to the work force. She is tearful today considering all these things. Unfortunately, there is not

10

> much more I can do for her. She will require medical care in
> the future. I would like to have a month pass and then see
> her back to make a final evaluation. I want to check a
> complete blood count, sed rate and a TSH.

[Dkt. 14-2, p. 127].  There is no indication in the record that Plaintiff ever returned to Dr.

Traub for his final evaluation.

Plaintiff saw Ms. Mead on October 4, 2006 for vaginal problems, mood changes,

anxiety and depression. [Dkt. 14-2. 162].  She was prescribed Bactrim (an antibiotic),

Xanax and Cymbalta.[10]   Ms. Mead rechecked Plaintiff on November 1, 2006 and

reported Plaintiff's depression was "a little better, still having some problems" and that

the Cymbalta upset her stomach. [Dkt. 14-2, pp. 160-161].  Ms. Mead noted Xanax

works well on November 16, 2006, that Plaintiff requested increase of Cymbalta which

she authorized and reported that she told Plaintiff to continue to exercise as tolerated.

[Dkt. 14-2, p. 159].

The last treatment notation recorded prior to the expiration of Plaintiff's insured

status was signed by Arlynn Irish, PA-C, of the Oklahoma Physician's Group on

November 20, 2006. [Dkt. 14-2, p. 154].  Plaintiff was noted to be requesting Lortab.

She claimed she could not be seen by Dr. Anagnost because of an outstanding

financial obligation there. She reported she has post-surgical degenerative joint

disease, depression and hypertension and that she sees "Melanie for depression for

---

[10]  Xanax is indicated for management of anxiety disorder or the short-term relief of symptoms
of anxiety. PDR, 53rd ed. (1999) 2516. Duloxetine (Cymbalta) is used to treat depression and
generalized anxiety disorder (GAD; excessive worry and tension that disrupts daily life and lasts for 6
months or longer). Duloxetine is also used to treat pain and tingling caused by diabetic neuropathy
(damage to nerves that can develop in people who have diabetes) and fibromyalgia (a long-lasting
condition that may cause pain, muscle stiffness and tenderness, tiredness, and difficulty falling asleep
or staying asleep). See drug information online at: http://www.nlm.nih.gov/medlineplus/druginfo/meds
/a604030.html (last revised 03/01/2009)

which she takes Cymbalta." *Id.* "She says that she has been on Lortab 7.5/500 mg and has run out and is having a lot of pain that radiates down to both arms and down to the middle of her back." *Id.* The PA "explained to her that neither Dr. Landgarten nor myself prescribed long-term pain medication that I will give her some Lortab 7.5/500 mg 30 of them 1 time refill only, but I will have my nursing staff set her up with Dr. Reddy for pain management." *Id.*

### Agency RFCs

In the record are two Physical RFC forms signed by agency medical consultants who reviewed medical records but did not examine Plaintiff. [Dkt. 14-2, pp. 18-25; 135-142]. Both forms reference a date last insured of December 31, 2005. [Dkt. 14-2, pp. 18, 135]. The correct expiration date is December 31, 2006. [Dkt. 14, p. 11].

The first RFC is dated March 27, 2006, and was prepared by Penny Aber, M.D. [Dkt. 14-2, pp. 18-25]. Dr. Aber determined Plaintiff was able to lift and/or carry 50 pounds occasionally, 25 pounds frequently, stand and/or walk and sit about 6 hours in an 8-hour workday and had no push and/or pull limitations. [Dkt. 14-2, p. 19]. Dr. Aber found no manipulative, visual, communicative or environmental limitations. [Dkt. 14-2, pp. 21-25]. However, she did assess postural limitations of occasional balancing and kneeling. [Dkt. 14-2, p. 20]. As explanation for her findings, Dr. Aber said:

> Claimant is s/p MVA in 9/05. Complains of pain and numbness. MRI in file shows bulging discs at C3/4, C4/5, C5/6 and C6/7 with moderate spinal canal stenosis. Is being treated with ESI, physical therapy and a TENS unit. As of 12/05 MER indicates she is still having symptoms of radiculopathy, numbness and tingling but she is improving. No neurologic deficits c/w myelopathy or radiculopathy. DLI is 12/31/05. It is felt however that claimant would have this

12

> RFC, with expected improvement with treatment, by twelve
> months from MVA.

[Dkt. 14-2, p. 19].

The second RFC is dated October 27, 2006, and was prepared by Luther

Woodcock, M.D. [Dkt. 14-2, pp. 135-142].  Dr. Woodcock assessed Plaintiff as able to

lift and/or carry 50 pounds occasionally, 25 pounds frequently, stand and/or walk and

sit about 6 hours in an 8-hour workday and unlimited push and/or pull. [Dkt. 14-2, p.

136].  He wrote:

> THIS IS A TII ONLY CLAIM - AOD - 9/16/05 WITH DLI OF
> 12/05. THIS IS THE TIME PERIOD THAT IS BEING
> EVALUATED. 9/05 - Claimant was in MVA. Cervical MRI
> noted bulging discs with moderate spinal canal stenosis.
> 12/05 Exam noted some symptoms of radiculopathy but
> improving. No neuro deficits. As of 11/05, she was
> undergoing epidural steroid injections. 10/05 Chiropractic
> Note - some muscle spasm and loss of ROM with
> diminished grip. She was still in a recovery process from the
> 9/05 MVA.

*Id.* (emphasis in original).   No postural, manipulative, visual, communicative or

environmental limitations were indicated on the form.  On a case analysis form bearing

the same date, Dr. Woodcock wrote: "We cannot adopt the prior RFC. It is for the DLI

but also a durational that ended 9/06. We are past that date. We either need to have

a RFC for DLI only, or allow with a closed period." [Dkt. 14-2, p. 134].

### **The ALJ's Decision**

At the hearing on July 12, 2007, the ALJ presented the vocational expert (VE)

with the following hypothetical:

> Assume the claimant is a 40-year-old female with high
> school education, three semesters of college with the ability
> to read, write, and use numbers. Assume further the

> individual in general has the physical capacity to perform
> work consistent with the limitations of Exhibit 12F and I'm
> going to modify that exhibit and place the exertional
> limitation as to lifting to the light level.

[Dkt. 14, p. 50].  According to the Court Transcript Index provided by the Commissioner

as part of the administrative record in this case, Exhibit 12F is Dr. Woodcock's RFC

assessment dated October 27, 2006. [Dkt. 14, p. 2].  Based upon that hypothetical the

VE testified Plaintiff could not perform her past work. [Dkt. 14, p. 51].  The VE identified

a semi-skilled, light exertion level job, two unskilled light exertion level jobs and two

unskilled sedentary jobs that would fit within the hypothetical. [Dkt. 14, pp. 51-52].

Plaintiff's attorney pointed out to the ALJ that Dr. Woodcock's RFC referred to "a four

month window, a three and a half month window from 9/15/05 to 12/05." [Dkt. 14, p.

54].

In his written decision dated September 11, 2006, the ALJ set forth Plaintiff's

RFC as follows:

> After careful consideration of the entire record, the
> undersigned finds that, through the date last insured, the
> claimant had the residual functional capacity to perform light
> work with no more than occasional balancing and kneeling.

[Dkt. 14, p. 14].  The ALJ acknowledged the agency's regulations requiring him to

consider all the evidence in the record. [Dkt. 14, pp. 14-15].  He did not, however, cite

to specific evidence in the record that he relied upon for determining Plaintiff's RFC.

After paraphrasing Plaintiff's testimony at the hearing regarding her symptoms

and daily activities, the ALJ summarized some of Plaintiff's pre-surgery medical

treatment records. [Dkt. 14, p. 15].  The ALJ noted Dr. Anagnost's progress report two

weeks after her surgery. [Dkt. 14, p. 16].  He observed that Plaintiff's reports of

14

tremendous relief in the numbness and tingling in her arm to the PA on June 6, 2006 and July 25, 2006 conflicted with her complaints of dropping things and her shoulder and hand "giving out" and thus found those complaints to be not entirely credible. *Id.*

The ALJ then addressed Dr. Traub's November 8, 2005 opinion that Plaintiff was temporarily totally disabled and not capable of engaging in her usual position as a CNA. [Dkt. 14, p. 16].  Citing the differing issues between claims for purposes of workers' compensation and those made for Social Security benefits, the ALJ gave "only some weight" to Dr. Traub's pre-surgery report. *Id.*  He did not mention Dr. Traub's subsequent treatment notations.

The ALJ stated he did not discount all Plaintiff's complaints and that "she would undoubtedly have some pain." [Dkt. 14, p. 16].  He found Plaintiff's restricted daily activities were self imposed because the record contained no evidence that her treating physicians "have told her to lie down and [do] nothing all day." *Id.*  He said:

> Given the objective medical evidence in the record, the [ALJ] finds that the claimant's [RFC] is reasonable, and that the claimant could function within those limitations without experiencing significant exacerbation of her symptoms. Two medical experts with the State Agency determined that the claimant could perform greater than light work activity. (Exhibits 5F and 12F)

*Id.*

## Discussion

At the hearing, the ALJ handed Dr. Woodcock's completed RFC form, with a verbal modification for light lifting, to the VE when he described Plaintiff's RFC for the purpose of identifying jobs Plaintiff could perform.  In his written decision, the ALJ did not identify the evidence that led him to conclude Plaintiff could perform light work and

15

he did not explain how he concluded that Plaintiff's severe impairments consisting of status post fusion at C3-4 and C4-5 and degenerative disc disease caused functional limitations in Plaintiff's ability to balance and kneel.  Since the only place in the record where such limitations are found is in Dr. Aber's March 27, 2006 RFC opinion, it appears the ALJ's RFC in his written decision was based upon her assessment.  The ALJ did not explain how he resolved the inconsistency between the two opinions or his reasons for using one at the hearing and the other in his decision.

There is no dispute that the date Plaintiff's insured status expired was December 31, 2006. [Dkt. 14, p. 11; Dkt. 15, p. 2; Dkt. 16, p. 1].  Neither RFC opinion provided by the agency consultants incorporated the correct expiration date.  In his written decision, the ALJ did not expressly adopt either opinion in his RFC determination but he did cite the agency consultant opinions as support for his credibility findings.  Neither consultant RFC opinion covers the time period between January 1, 2006 and December 31, 2006.  Both are merely checkmark-style evaluation forms unaccompanied by thorough written reports or persuasive testimony.  Therefore, neither opinion provides sufficient medical evidence to support the ALJ's findings regarding Plaintiff's RFC as of December 31, 2006. *See Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987) (RFC form, standing alone, does not constitute substantial evidence).

Other than those two agency consultant assessments, the record is devoid of any medical opinion regarding limitations imposed by Plaintiff's severe impairments of status post fusion at C3-4 and C4-5 and degenerative disc disease.  Dr. Traub observed that Plaintiff "will be unable to lift patients in the future" but he did not offer an opinion regarding Plaintiff's ability to perform other duties associated with her past work

16

or any other line of work. None of Plaintiffs treating sources defined either the level of exertion she could perform or her functional limitations after her surgery but before the expiration of her insured status. Consequently, the record contains no medical foundation for the ALJ's conclusions regarding Plaintiff's ability to engage in work activities.

The lack of medical evidence in the record upon which to formulate an RFC determination left only the nonmedical evidence to consider which consisted of Plaintiff's subjective complaints. The ALJ was required to decide whether he believed Plaintiff's claims of inability to perform work activities. *See* 20 C.F.R. § 404.1545(a)(3) (in addition to medical evidence, the ALJ considers the claimant's own testimony concerning her limitations, including limitations resulting from pain, in assessing RFC); *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir. 1987) (if impairment is reasonably expected to produce some pain, allegations of disabling pain emanating from that impairment require consideration).

In the course of determining whether a claimant's statements regarding pain are credible, an ALJ should consider such factors as: "the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly with the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1489 (10th Cir. 1993); Soc.Sec.Rul. 96-7p, 1996 WL 374186 at *3.

At the hearing, Plaintiff claimed that she drops things and her hand and shoulder "give out."   She testified that this problem was not caused by pain but by muscle spasms.  The ALJ concluded that these claims were not credible and his finding in this regard is not contradicted by the medical evidence.  None of Plaintiff's medical care providers recorded such complaints in their treatment records.  The Court agrees that Plaintiff's assertion at the hearing that muscle spasms lead to total inability to use her right hand and that she has to use her left hand to brush her teeth and comb her hair, are made less credible by her failure to even mention that issue to any of her treating sources.

The same is not true, however, with regard to Plaintiff's complaints of neck pain that radiates to her shoulders, limitation of motion of her head and neck and severe headaches.   The record contains ample documentation of Plaintiff's complaints of continuing neck and shoulder pain and headaches as well as observations by medical sources of pain and restricted range of motion of the neck and upper back after fusion surgery and plate placement in her cervical spine. The ALJ acknowledged the factors to be considered in evaluating Plaintiff's credibility [Dkt. 14, p. 15] but he did not refer to any specific evidence relevant to those factors in his decision. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir.1995) (holding ALJ's credibility determination inadequate where ALJ simply recites the general factors he considered and then finds claimant not credible based on those factors without stating what specific evidence he relied on for that conclusion).   He did not, for example, mention the portions of the record that confirm Plaintiff's attempts to obtain relief from her neck and shoulder pain and headaches both before and after surgery, including undergoing frequent examinations and consultations

18

with medical professionals, regular physical therapy treatments, use of an "e-stim" unit and home exercises, steroid injections,  medication and finally surgery with post-surgical follow-up, therapy and medication.  The record contains no suggestion by any of Plaintiff's treating sources that her complaints of neck and shoulder pain were fabricated or exaggerated.  The ALJ did not affirmatively link his credibility findings to substantial evidence in the record with regard to Plaintiff's allegations of severe neck and shoulder pain, limited range of motion and headaches.

The ALJ said Plaintiff "would undoubtedly have some pain" in view of her surgery but he did not mention pain in his hypothetical to the VE and he did not state how his RFC accommodated Plaintiff's pain and limited range of motion of the neck.  In his written decision, the ALJ did not specify the degree of pain he concluded Plaintiff suffered or how that pain impacted her ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. *See Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (ALJ must make specific RFC findings); *see also Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999) (RFC findings must be supported by substantial evidence).  Instead, he disregarded Plaintiff's claims of severe headaches, neck and shoulder pain and limited range of motion.  The only medical evidence he cited as support for his credibility finding with regard to Plaintiff's level of pain was the two agency physicians' RFC opinions, which do not provide substantial evidence for the time period after December 2005.

The ALJ did not identify the objective medical evidence that he claimed supported his RFC finding.  He simply observed that Plaintiff's treating physicians did not restrict her activities "to lie down and do nothing all day."  That none of Plaintiff's

19

treating sources described or prescribed limited activities for her does not indicate they thought Plaintiff's pain was not severe.  "While the absence of an objective medical basis for the degree of severity of pain may affect the weight to be given to the claimant's subjective allegations of pain, a lack of objective corroboration of the pain's severity cannot justify disregarding those allegations. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1220 (10th Cir. 2004) (quoting *Luna*, 834 F.2d at 165).

The ALJ's determination that Plaintiff's allegations of severe neck and shoulder pain, limited range of motion and severe headaches were not credible is therefore not supported by substantial evidence. Although the Court ordinarily defers to the ALJ as trier of fact on credibility, deference is not an absolute rule.  *Frey*, 816 F.2d  at 517. Upon remand, the ALJ must assess the level of pain Plaintiff suffers and determine whether there are jobs she can do with that level of pain. *Thompson*, 987 F.2d at 1490.

### Mental Impairment

With regard to Plaintiff's contention that the ALJ erroneously failed to include a severe mental impairment in his RFC findings, the Court finds no merit.  As the ALJ observed, Plaintiff first mentioned depression to Dr. Landgarten in May 2006.  The next reference in the record was made by Ms. Mead in October 2006 who then prescribed medication.  All subsequent medical reports through December 31, 2006, indicate Plaintiff's depression was improved and controlled with medication.  Plaintiff has not demonstrated any functional limitations imposed by a mental impairment that more than minimally impacted her ability to perform work activities prior to the date her insured status expired. The ALJ set forth his PRT findings pursuant to 20 C.F.R. §§

20

404.1520a(c)(3), 416.920a(c)(3), and nothing in the record overwhelms or contradicts his conclusion that Plaintiff did not have a severe mental impairment at step two.

### Conclusion

Because there is no medical evidence to support the ALJ's physical RFC findings and because the ALJ failed to properly assess Plaintiff's credibility regarding severe neck and shoulder pain, limited range of motion and headaches, the Court cannot say the Commissioner's conclusion that Plaintiff was not disabled prior to the date her insured status expired is supported by the record.  Accordingly, the case is reversed and remanded for reconsideration on that basis.

SO ORDERED this 24th day of July, 2009.

*Frank H. McCarthy*

FRANK H. McCARTHY
UNITED STATES MAGISTRATE JUDGE